# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

VALERIE MUNIZ,

        Plaintiff,

v.                                                                No. CIV 05-325 LFG

JO ANNE B. BARNHART,
Commissioner, Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Valerie Muñiz ("Muñiz") invokes this Court's jurisdiction in accordance with § 205(g) of the Social Security Act, 42 U.S.C. § 405(g). She seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") determining that her disability ceased on August 1, 1999. [RP 15.] Muñiz contends that reversal and remand are required because the final administrative decision was not supported by substantial evidence, the Commissioner failed to satisfy her burden of proof and the Commissioner did not apply the correct legal standards to her case. [Doc. Nos. 11, 12.]

Muñiz was born on February 14, 1960 and was 43 years old when the administrative hearing was held. [RP 61.] She is married and lives with her husband and her 25 year-old daughter. [RP 61.] At the time of the hearing, her daughter was unemployed. Her 19 year-old son comes and goes from the home. [RP 61.] Muñiz and her husband both have been living on disability benefits. [RP 97.] Muñiz has a limited tenth grade education and has failed the GED twice. [RP 16, 63.]

1

Muñiz has past relevant work as a cashier, grocery stocker and nurse's aide. [RP 16.] An exact chronology of her work history is unavailable since Muñiz does not remember the dates of her employment. [RP 99.] For example, Muñiz testified at the administrative law hearing that she was last employed in 1993 or 1994 with Las Lunas Hospital and Training School. [RP 63.] The disability forms state that her last day of employment was June 13, 1993. [RP 64.] However, in 1999, she reported to Dr. Sacks during a psychiatric consultative exam that she injured her back lifting patients while working at Los Lunas Hospital and Training School in 1986, was out of work on workers compensation for 6 months and had not worked since 1986. [RP 278.] Muñiz's earning records indicate that she had several jobs after 1986. She denied having worked in Arizona at some point, although her earning records appear to indicate she did. [RP 100.]

Effective June 13, 1993, Muñiz was awarded disability insurance benefits ("DIB") and social security income benefits ("SSI"), due to a combination of mental and physical impairments, including neck strain, chronic gastrointestinal problems, chronic headaches, and depression. [RP 114-19, 124, 126.] On August 11, 1999, the Social Security Administration ("SSA") notified Muñiz that her medical condition had improved and that her period of disability ended August 1, 1999, because she was able to work. Muñiz's benefits were terminated, effective October 31, 1999. [RP 15, 23, 126, 127.] Muñiz sought reconsideration of the decision to stop her benefits but the disability hearing officer affirmed the decision. [RP 134, 140-45.]

Muñiz also filed an application for social security benefits in December 1998, alleging impairments related to her back, anxiety, depression, hair loss and possible heart problems. [RP 439.] This application indicates that both Muñiz and her husband were receiving disability benefits (totaling about $900.00/month), she from the SSA, and he from the Veteran's Administration. [RP 440.]

After the SSA determined that Muñiz's benefits should be terminated, Muñiz requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on March 18, 2003, at which time Muñiz was present and represented by counsel.[1] [RP 57-110.] On July 25, 2003, the ALJ issued a decision denying DIB and SSI, and finding, *inter alia,* that Muñiz had undergone "medical improvement" related to her ability to work. [RP 12-24.] Plaintiff appealed the ALJ's decision to the Appeals Council. In February 2005, the Appeals Council denied Muñiz's request. This appeal followed.

This case has lingered over a fairly substantial number of years after the SSA determined that Muñiz was no longer entitled to receive benefits in August 1999. [RP 15, 124.] In August 1999, Muñiz was also informed that her December 1998 benefit application was denied. [RP 447.] The ALJ issued his decision in 2003. The Appeals Council did not take action until February 2005. [RP 7.]

---

[1]Three other ALJ hearings were scheduled in 2001. On September 9, 2001, ALJ John Morris was prepared to conduct the hearing. Muñiz attended but without legal counsel. Judge Morris granted a continuance when Muñiz stated that she had attempted to locate an attorney but that the hearing was scheduled too soon. [RP 39.] On October 18, 2001, Judge Morris again opened the hearing asking Muñiz about the status of her attempts to retain counsel. [RP 41.] Muñiz presented the same excuse, i.e., that she had not had time to find counsel. The ALJ informed Muñiz that he would again continue the hearing, but that this was the last continuance. The judge provided Muñiz with some information regarding attorneys who represent social security applicants. [RP 43.] On December 4, 2001, ALJ Mary Ann Lunderman was prepared to conduct the hearing. [RP 50.] Again, Muñiz appeared without counsel and Judge Lunderman continued the hearing so that Muñiz could find counsel and the agency could obtain Muñiz's recent medical records. [RP 50.] Over a year passed before the next administrative law hearing was scheduled and held. [RP 55.]

Some of the delays are attributable to Muñiz.  For example, it appears that she did not receive notice of one of the earlier hearings in 2000 or 2001 due to her failure to notify the agency of a new address.  [RP 146.]  Three hearings were scheduled in 2001, and Muñiz failed to obtain counsel for any of the hearings, thus requiring continuances.  At that point, the subsequent delays may be attributed to the agency.  Over a year elapsed before another ALJ hearing was scheduled and held in 2003, and again, more than year passed before the Appeals Council acted in 2005.  It appears that Muñiz elected to collect benefits during this six-year period with the understanding that she could owe the agency a significant sum of money should she lose her appeal.   [RP 38-39, 132, 148.]

## Standards for Determining Disability

### A.     Five-Step Sequential Evaluation Process

In order to qualify for DIB or SSI, an applicant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months that prevents the applicant from engaging in substantial gainful activity.  Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993).

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]

**B.  Continuing Disability Review ("CDR") and Medical Improvement ("MI")**

---

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

In cases where a claimant was awarded disability benefits for some period, the agency must "review [her] case periodically[11] to determine whether there has been any medical improvement in the claimant's condition and whether that improvement affects [her] ability to work." Shepherd v. Apfel, 184 F.3d 1196, 1199 (10th Cir. 1999) (*citing* 20 C.F.R. § 404.1594)). If the claimant's condition has improved, her eligibility to continue receiving benefits may be terminated. Id. In a CDR, the Commissioner bears the burden of showing that the claimant can perform substantial gainful activity. Glenn v. Shalala, 21 F.3d 983, 987 (10th Cir. 1994). But, in so doing, there is no "inference as to the presence or absence of disability drawn from the fact that the individual has previously been determined to be disabled." 42 U.S.C. § 423(f).

Before terminating a claimant's benefits, the Commissioner must show by substantial evidence: that the claimant's medical condition has improved; that the improvement is related to her ability to work; and that the claimant is currently able to engage in substantial gainful activity. 20 C.F.R. § 404.1594; 42 U.S.C. § 423(f).

"Medical Improvement" ("MI") is defined as:

> any decrease in the medical severity of [the] impairment(s) which was present at the time of the most recent favorable medical decision [the claimant was] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvements) in the symptoms, signs and/or laboratory findings associated with [the] impairments.

Shepherd, 184 F.3d at 1199 (*citing* 20 C.F.R. § 404.1594(b)(1)). Medical improvement is not related to a claimant's ability to do work if there has been a decrease in the severity of the impairments,

---

[11]The SSA, from time to time, conducts a continuing disability review ("CDR") to determine whether an individual who was awarded benefits is still disabled. 20 C.F.R. § 404.1589, § 404.590.

without an increase in the claimant's functional capacity to do basic work activities.  20 C.F.R. §

404.1594(b)(2).

The Tenth Circuit further advised that in applying the "MI" test, the ALJ:

> must first compare the medical severity of the current impairment(s)
> to the severity of the impairment(s) which was present at the time of
> the most recent favorable medical decision finding the claimant
> disabled.  Then, in order to determine that medical improvement is
> related to ability to work, the ALJ must reassess a claimant's residual
> functional capacity (RFC) based on the current severity of the
> impairment(s) which was present at claimant's last favorable medical
> decision.  The ALJ must then compare the new RFC with the RFC
> before the putative medical improvements.  The ALJ may find medical
> improvement related to an ability to do work only if an increase in the
> current RFC is based on objective medical evidence.

Shepherd, 184 F.3d at 1201 (internal citations omitted).

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by

substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v.

Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and

sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than

a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir.

2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The

Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d

1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor

reweigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945

F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the

correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled, or in this case, that the claimant continues to be disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After reviewing Muñiz's testimony, medical records, symptoms, complaints, and a comparison of her impairments as of the date of the most recent favorable decision with her current functional capacity to do work, Judge William F. Nail, Jr. concluded that Muñiz's medical improvement had resulted in an increase in her RFC and that she was now able to perform a limited range of light work. Thus, the ALJ determined that Muñiz had undergone medical improvement related to the ability to work. He further concluded at step five of the sequential evaluation process, with the assistance of a vocational expert's testimony, that Muñiz was able to make a successful adjustment to work that exists in significant numbers in the national economy. Ultimately, the ALJ determined that Muñiz's

disability was correctly ceased, effective August 1, 1999 and that her entitlement to benefits was correctly terminated, effective October 31, 1999.  [RP 22.]

In so deciding, the ALJ made the following specific findings:

(1)  Muñiz had not engaged in substantial gainful activity since the alleged onset of disability;

(2)  her medically determinable impairments were severe but did not meet a listing, either alone or together;

(3)  Muñiz underwent medical improvement related to her ability to work;

(4)  the ALJ carefully considered all of the medical opinions in the record;

(5)  Muñiz had the RFC for a limited range of light work consistent with the hypothetical question posed to the vocational expert;

(6)  Muñiz was unable to perform her past relevant work;

(7)  she was a "younger individual" during the period at issue, with a "limited education";

(8)  Muñiz had no transferable skills from any past relevant work; and

(9)  although Muñiz's exertional limitations do not allow her to perform the full range of light work, there is a significant number of jobs in the national economy that she can perform, including, e.g., cashier, ticket seller, final assembler of eyeglasses.  [RP 22-23.]  Finally, the ALJ concluded that Muñiz was correctly determined to be no longer under a disability within the meaning of the SSA, beginning August 1, 1999.  [RP 23.]

## Summary of Muñiz's Medical Conditions and Care

Most of the medical records in this case run from 1998 through 2002.  There are a few medical records, along with disability records from 1994 and before.

### *1992-1997 Records:*

It appears that Muñiz was in a car accident in December 1992 that resulted in neck and back pain.[12]  [RP 18, 116.]  June 13, 1993 was the last day Muñiz worked, according to some records and statements she made.  [RP 64.]  1986 is the last year Muñiz worked according to other records.  [RP 278.]

On December 2, 1993, treating physician Dr. Levitt concluded that based on Muñiz's chronic pain syndrome in her neck and back, along with headaches, she was unable to engage in gainful employment.  Her depression was also an issue.  [RP 18.]  On May 2, 1994, Muñiz complained to Dr. Harville of hair loss.  She had multiple small spots of alopecia.  [RP 239.]  She was given some prescription medication for her hair loss and advised to use it sparingly.  She had to re-fill it a few months later.  In October 1994, she returned to the doctor with several areas of hair loss again.  Muñiz also complained of two ruptured discs in her back.  As of October 1994, Muñiz was taking prescriptions medications of Lorcet,[13] Lorazapam,[14] Prozac (for depression), Soma (for sleep), and Fluocinonide (for hair loss).  [RP 239.]

---

[12]Other records indicate that Muñiz suffered the primary back injury while lifting patients at work in 1986.  [RP    ]

[13]"This medication is a combination of a narcotic (propoxyphene) and a non-narcotic (acetaminophen). It is used to treat mild to moderate pain."  www.webmd.com

[14]Used to treat anxiety.  www.webmd.com

On December 7, 1994, ALJ John Boltz concluded that Muñiz was disabled and entitled to an award of benefits.  [RP 116.]  The ALJ concluded that Muñiz's capacity for work was materially diminished by the "effects of a low back sprain, chronic diarrhea, dysthymic disorder, alcohol abuse and an atypical personality disorder."  Judge Boltz noted that Muñiz had a history of alcohol abuse that began in her teenage years and continued until about 1990.  Her persistent abdominal distress stemmed from her past alcohol abuse.  Muñiz suffered from depression, crying spells, anxiety, sleep problems, and occasional "fleeting suicidal ideation."  [RP 116.]  Muñiz's headaches, pain, use of narcotics and other medications, lack of sleep and need to nap compromised her mental alertness and ability to sustain normal work schedules.  [RP 117.]  The ALJ made a determination of disability at step five of the sequential process.  [RP 118.]

There is a single medical record, from 1995.  Muñiz saw the doctor for her hair loss problem again.  She was given two bottles of prescription medication and told again to use it sparingly.  [RP 239.]  There are no medical records from 1996 or 1997, other than an April 7, 1997 medical note indicating Muñiz was a "no show" for a medical appointment with Dr. Harville.  [RP 239.]

Other later medical records indicate that Muñiz was an IV drug user in about 1997.  It is not clear how long she was an IV drug user.  [RP 307.]  She may or may not have used after 1997.

### ***1998 Records:***

A radiology report related to an MRI of Muñiz's lumbar spine, read in April 1998 (perhaps mistakenly dated February 23, 1998) shows lumbar disc disease with a history of a "lifting injury" in 1993. The record notes significant loss of height and signal in L4-L5 and the L5-S1 discs.  There was left disc herniation at L5-S1 and mild herniation at L5-S1.  [RP 255.]

11

Dr. Sanchez was Muñiz's treating doctor during this period.  He saw her on April 21, 1998 for complaints of left leg pain.  It appears from the record that Dr. Sanchez might have refilled a prescription for Muñiz but the handwriting is not clear.  [RP 254.]  On April 27, 1998, Muñiz again saw Dr. Sanchez for her back pain.  He refilled her prescription of Percocet[15] for 50 tablets.  [RP 253.]

On May 14, 1998, Muñiz saw Dr. Jeffrey Johnson of Neurological Associates.  She complained of severe low back pain ("LBP") and left leg pain.  She described the pain as having started in 1994 without any specific inciting event.  She had been treated with medication and epidural injections, but said the injections were of no help.  Her pain resolved eventually over a period of months and she had had non-severe flare-ups over the following years.  She stated that she was not taking any medications or doing any therapy for it.  In 1997, the pain returned and was "very severe," or "excruciating."  She had been taking Percocet with only moderate relief.  The medical record notes that Muñiz smoked and drank occasionally[16] but that there was no history of substance abuse.  [RP 264.]  This is contrary to subsequent medical records indicating substance abuse in about 1997.  [RP 307.]

Upon examination, Dr. Johnson noted that there was full "passive range of motion" in Muñiz's back, without pain.  She exhibited normal strength and tone.  Her gait and station were normal.  She tested positive on the left for a straight leg raise.  Dr. Johnson read the April MRI to indicate a large

---

[15]"This medication is a combination of a narcotic (oxycodone) and a non-narcotic (acetaminophen) used to relieve moderate to severe pain. Oxycodone works by binding to opioid receptors in the brain and spinal cord, and acetaminophen decreases the formation of prostaglandins, therefore relieving pain."  www.webmd.com

[16]Although this record indicates Muñiz occasionally drank alcohol, the earlier ALJ decision in 1994 reflected that Muñiz had an alcohol abuse problem for many years.

disc herniation at L4-5 with an "enormous free fragment blocking neural foramen on the left."  Muñiz opposed trying epidurals again because she had received no benefit from that treatment in 1994.  She favored surgery.  [RP 264.]

Muñiz again saw Dr. Sanchez on May 15, 1998, about 18 days after her last appointment with him.  She needed another refill of Percocet for back pain.  He refilled the prescription again for 50 more tablets.  The record notes that Muñiz was scheduled for surgery in two weeks.  [RP 252.]  On June 5, 1998, Dr. Sanchez noted that Muñiz requested refills on her medications.  It appears that the Percocet prescription was refilled again, but the medical record is not entirely legible.  [RP 251.]

On June 23, 1998, Dr. Sanchez indicated that Muñiz needed refills on Percocet and Xanax.[17]  The note states that Muñiz was scheduled for back surgery in July but that she was attempting to postpone it until the 15th.  Another note on the medical record indicates that the doctor called some pharmacies and determined that Muñiz had filled the Percocet #50 on June 1 and another prescription for Percocet #50 at another pharmacy on June 6.  Dr. Sanchez or his nurse told Muñiz that she had an "addiction problem."  [RP 250.]

On July 18, 1998, disability services conducted an interview.  Muñiz reported depression and back problems.  She was waiting to have back surgery.  She was unable to walk much and suffered from a lot of back and leg pain.  [RP 184.]  She was able to visit with her parents a few minutes each day, but mostly she read at home or watched television.  [RP 185.]  Muñiz complained of sleep problems and "lots of anxiety."  [RP 186.]

---

[17]Xanax or "alprazolam is used to treat anxiety and panic disorders. It belongs to a class of medications called benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect." www.webmd.com

On July 21, 1998, Muñiz was given another refill of Percocet #50.  [RP 249.]  On August 8, 1998, Dr. Sanchez apparently refused her request to refill the Percocet prescription, noting that he had refilled it on July 21, 1998.  He gave her some samples of Ultram.[18]  She complained of chronic pain that day.  [RP 248.]  On August 20, 1998, Dr. Sanchez refilled Muñiz's prescriptions of Percocet #50 and Xanax #30.  She complained of ruptured discs.  [RP 247.]  A Physician's Assistant signed this medical record.

On September 2, 1998, Dr. Johnson performed surgery on Muñiz for her herniated intervertebral disc at left L4-5.  He performed a lumbar microdiscectomy.  [RP 262.]  One week after the surgery, Muñiz reported that the severe leg pain was gone.  [RP 261.]  On September 18, 1998, Muñiz requested pain medications from Dr. Sanchez's office.  She was prescribed Roxicet[19] #40 and Xanax #10.  Muñiz reported that her low back pain persisted but was improving.

On October 6, 1998, Jacque Pasternacki, a Physician's Assistant, noted that Muñiz had post-operative limitations: she was not to lift more than 20 pounds and was not to engage in repetitive bending or twisting of the spine, or prolonged sitting or standing.  [RP 260, 276.]

On November 23, 1998, Muñiz reported to Dr. Sanchez that she was having back pain.  She also suffered from hair loss again and needed to see a dermatologist.  [RP 243.]

On November 30, 1998, Dr. Johnson's records indicate that Muñiz came to the office without an appointment.  She complained of continued low back pain, although her leg was pain free.  Dr. Johnson refilled Muñiz's prescriptions but provided her with strict instructions as to their use.  [RP 259.]

---

[18]Ultram or tramadol is used for pain relief.  www.webmd.com

[19]Roxicet appears to be another name of Percocet or Oxycodone.  www.webmd.com

On December 7, 1998, Muñiz signed an application for SSI benefits based on impairments of her back, anxiety, depression, hair loss and possible heart problems.  There are no medical records documenting heart problems, other than some family history for heart problems.  [RP at 439, 440.] The SSA later denied her application for SSI, indicating that Muñiz should be able to perform light level non-public work.  [RP 443.]

Also on December 7, 1998, disability services conducted an interview of Muñiz, who stated that her back problems had worsened and that she underwent back surgery in September 1998.  She could not walk much or exercise.  She needed help brushing her hair and tying her shoes.  Muñiz was able to cook, clean, shop and do odd jobs but needed help.  [RP 193.]  She did not drive.  She watched television four hours each day and read the bible 20 minutes a day.  The interviewer observed Muñiz's severe hair loss.  [RP 197.]

Muñiz saw Dr. Sanchez on December 9, 1998.  He gave her a trial of Prozac.  The remainder of the record is illegible.  [RP 242.]  On December 14, 1998, Dr. Johnson filled out a form "to whom it may concern," stating that Muñiz could return to work in "community service."  The line for date of return to work is crossed out.  Nothing in the record explains whether Muñiz was or had been providing community service.  [RP 258.]

On December 21, 1998, Muñiz again showed up at Dr. Johnson's office without an appointment.  She reported that she had slipped, and twisted and hurt her back again.  She requested more pain medications.  Dr. Johnson showed Muñiz prior copies of her prescriptions and told her he would not continue to distribute narcotic agents for her and that she would need to find someone else to supervise her care.  However, he gave her one last refill of Percocet #30, but informed her it was the last one.  Dr. Johnson's staff reported that they observed Muñiz in the waiting room talking on the

courtesy telephone regarding the sale of prescription medications and that she also approached another patient in the waiting room asking to buy that patient's prescriptions.  Dr. Johnson advised his staff to no longer admit her to the office.  [RP 257.]

On December 21, 1998, Muñiz also saw a dermatologist regarding her hair loss.  [RP 269.] Dr. J. Wendall Robison noted that Muñiz had had various forms of *alopecia areata* for 12 years. Muñiz reported that she would have significant regrowth of hair followed by significant loss of hair. The medical record indicates that Muñiz was under significant stress from financial and family problems ("teenage children").  She hitchhiked to her appointment that day.  Muñiz's thyroid screen in the past was normal.  She had tried different treatments for her hair loss, including an injection into her scalp that promoted rapid regrowth of her hair and a topical solution that resulted in partial regrowth.  She reported that the Rogaine burned, and the dermatologist noted that it did not "sound like she was very compliant."   The longest time Muñiz had used Rogaine was six weeks, and Dr. Robison suggested using it for 6-12 months.  [RP 269.]

### *1999 Records:*

In 1999, Muñiz's treating physician was Dr. Stanford Varnado, D.O.  Dr. Varnado ordered lab work for Muñiz and the results showed that her rheumatoid factor was high and her ANA ("antinuclear antibodies") was high.[20]  Muñiz saw Dr. Varnado on February 1, 1999.  She continued to complain of back pain and stated the pain registered a "7" on a scale of 1-10.  She needed refills of Lortab, Xanax, Soma and Prozac.  It appears the Dr. Varnado gave her prescriptions or refills for Zoloft, Lortab and Xanax.  [RP 273.]

---

[20]ANA are almost invariably found in systemic lupus erythematosus and are frequently found in rheumatoid arthritis, scleroderma, and mixed connective tissue diseases.  Dorland's, 93.  There is no further mention in Muñiz's medical records regarding a possible diagnosis of rheumatoid disease or lupus.

On February 5, 1999, Dr. Helen Patterson, Ph.D. performed a mental RFC assessment of Muñiz.  [RP 282.]  She found no evidence of limitations in most categories.  Muñiz was not significantly limited in attention and concentration and performance of activities within a schedule. She was not significantly limited in most categories of adaptation but was moderately limited in her ability to respond appropriately to change in the work setting.  [RP 283.]  Patterson wrote: "Claimant demonstrates adequate capacity to perform at least simple routine, repetitive tasks with possible moderate restriction in adaptability due to chronic depression and maladaptive personality traits." [RP 284.]

On March 5, 1999, Dr. Varnado refilled Muñiz's prescriptions of Xanax, Lortab and Soma. She stated she could not change her "bad mood swings."  The record is difficult to read but appears to state Muñiz was screening all of her telephone calls, suffering panic attacks and anxiety and was fatigued.  [RP 272.]

On March 19, 1999, Dr. Varnado again refilled prescriptions for Muñiz, including Xanax and Hydrocodone.  She complained of insomnia, anxiety and alopecia.  [RP 271.]  On March 30, 1999, Dr. Varnado appears to have refilled Muñiz's prescription of Lortab and to possibly have given her some Paxil.  She requested a refill of Xanax, and the record is not clear as to whether it was refilled too.  [RP 271.]

On April 9, 1999, Muñiz did not appear for her consultative exam with Dr. Balcazar and later, when asked, blamed the doctor's office for her failure to appear.  However, Dr. Balcazar's records indicate that Muñiz neither appeared for her exam nor telephoned to cancel.  [RP 303.]

On June 8, 1999, Dr. Steven Sacks performed a psychiatric consultative exam.  He was directed to assess Muñiz for possible psychiatric impairments and subsequent restrictions in activity.

He was also asked to comment on Muñiz's effort and cooperation during the exam. Dr. Sacks' notes reflect that Muñiz was married, unemployed, lived with her second husband and 15 year-old son in an apartment. They had been living there since January 1999. Muñiz's husband accompanied her to this appointment by city bus. Muñiz stated that she had not driven or obtained a driver's licence since her auto accident in 1992. She was referred to a psychiatrist in about 1993 and received a "one-time" evaluation during which she was told she had depression. Her primary physician then prescribed Prozac for her. Muñiz continued taking Prozac through the time she moved to Belen in 1997. In 1999, she moved to Albuquerque and was prescribed Paxil. She was also placed on Alprazolam (Xanax). Muñiz's sleep problems improved with the medications.

Muñiz reported difficulties with her short term memory but denied problems with concentration. She was able to watch television; she never enjoyed reading. She denied suicidal ideation or suicide attempts. She told Dr. Sacks that she had no history of alcohol use/abuse [RP 278], although this is untrue based on the earlier ALJ's recitation of her history. She also denied drug use or abuse, which again is untrue based on Muñiz's statements to subsequent providers. Indeed, it was only a few years earlier that Muñiz engaged in IV substance abuse. [RP 307.]

Muñiz stated that she injured her back while lifting patients at work in 1986. She was on workers compensation for six months afterwards and had not worked since 1986. [RP 278.] At other times, Muñiz reported her last day of work was June 13, 1993. Muñiz told Dr. Sacks that Dr. Barry Ramo examined her in 1998 and diagnosed three ruptured discs. However, there are no corresponding medical records from Dr. Ramo or any other physician to this effect, unless Muñiz was referring to Dr. Johnson's surgery. She told Dr. Sacks that she had had back surgery last year but could not identify the surgeon. Muñiz stated that since 1995, she had been treated with Hydrocodone for back

pain, twice per day.  [RP 278-79.]  Muñiz stated she took Relafen[21] for inflammation along with a muscle relaxant.

Since her surgery, Muñiz had not had leg pain but still had back discomfort.  Dr. Sacks observed Muñiz, however, seated for the entire one-hour interview without appearing to be in discomfort.  Muñiz reported having been in a car accident in 1992 while backing out of the driveway but stated she had not required medical attention. She had suffered from alopecia since 1985.  Her father was an untreated alcoholic.  Muñiz dropped out of school in the 10th grade when she was pregnant with her daughter.  During that period, Muñiz worked as a nursing home aide doing office cleaning.  She moved in with her parents and was on welfare after her first marriage ended.  [RP 279.] In 1985, Muñiz worked for one year or more as a nursing tech, and her last employment was with Los Lunas Hospital and Training School in 1985-86 until her back injury.  Muñiz stated she was living on disability and welfare ever since.  Her current husband was on a VA pension, but Dr. Sacks noted that Muñiz was reluctant to speak about it, other than to say her husband had a seizure disorder and sometimes required nursing care from her.  Dr. Sacks observed Muñiz's husband ambulating in and out of the building that day.

Muñiz appeared somewhat anxious and moderately depressed but was fully cooperative.  She stated she rarely left home without her sister or husband.  She was able to prepare breakfast for herself and husband and do light household work.  She went with her sister to the laundromat.  Muñiz watched television and had no hobbies.  She appeared to be experiencing a major depression and had an element of anxiety with mild agoraphobia "maybe."  Dr. Sacks assigned a GAF of 75 during the

---

[21]Relafen or "Nabumetone is used to reduce pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID)."  www.webmd.com

last and current years.  Muñiz could understand and follow basic instructions.  She probably could maintain the attention needed to perform simple and repetitive tasks and somewhat more complex tasks.  She would have difficulty withstanding stress and pressure because of depression.  Her psychiatric impairment was moderate.  [RP 281.]

About a month later on July 5, 1999, Helen Patterson, Ph.D., filled out a psychiatric review technique form.  She determined that Muñiz suffered from affective disorders, anxiety-related disorders and personality disorders, based on her review of the medical records and Dr. Sacks' conclusions.  Patterson noted that Muñiz was not receiving any type of psychiatric care.  Her family appeared content to depend on public assistance programs since none of them were employed.  Patterson noted Muñiz's major depression, anxiety and mild agoraphobia [RP 289.]  Muñiz suffered from inflexible and maladaptive personality traits which caused either significant impairments in social/occupational functioning or subjective distress, including mood affect, pathological dependence.  [RP 290.] Patterson evaluated Muñiz in terms of the "B" criteria and noted slight limitations only with one or two episodes of deterioration.  [RP 292.]  On the front of the form, someone handwrote "No MI" indicating no medical improvement.  "No MI" is also typed on the form.  [RP 285.]

On July 7, 1999, the disability services caseworker noted that Muñiz's condition was very similar to what it was at the time of her "comparison point decision" ("CPD")", i.e., the previous ALJ's December 1994 disability determination.  [RP 303.]

On July 9, 1999, Dr. Nickerson, a medical consultant for disability services, filled out a Physical RFC Assessment.  [RP 294.]  The limitations noted were: occasional lifting of 20 pounds; frequent lifting of 10 pounds; standing/walking up to six hours; sitting up to six hours; unlimited pushing and pulling.  Muñiz had chronic LBP since 1992.  A July 1993 lumbar x-ray reported mild

degenerative changes.  In 1998, her LBP worsened and she had back surgery that year.  After the surgery, her leg pain was gone but her LBP recurred in November 1998.  Her treating neurosurgeon (Johnson) refused to see her after December 1998 due to her drug seeking behavior.  Occasional postural limitations were noted.  [RP 296.]

The notes in the disability services' records indicate that Dr. Nickerson considered Muñiz's assessment for medical improvement by examining the December 1994 time frame when Muñiz's function capability was described as less than a full range of sedentary work, due to chronic LBP, chronic diarrhea and psychological disorders.  [RP 304.]  Dr. Nickerson noted that recent records did not mention diarrhea but that Muñiz's LBP persisted and even worsened in 1998, requiring back surgery.  Ultimately, this record indicates that Dr. Nickerson found there "does not appear to have been MI related to claimant's ability to perform significant gainful activity."  [RP 304.]

On July 26, 1999, a caseworker with disability services requested that Dr. Rayme Romanik assess this case because of "differing opinions re: MI".  [RP 302.]  Dr. Romanik concluded, after reviewing the file, that there was MI.  In December 1994, the ALJ allowed benefits for a combination of physical and mental problems.  At that time, Muñiz had a cervical strain/sprain with reduced motion and point tenderness, chronic diarrhea with nausea/vomiting, and chronic headaches.  [RP 304.] Presently there was nothing in the record to reflect these problems, nor did Muñiz allege these same conditions in her recent December 1998 application for SSI.  Dr. Romanik noted that Muñiz had LBP and surgery in 1998, but again stated that the resolution of her neck discomfort, diarrhea and headaches supported a finding of MI and that Muñiz was capable of light work as assessed by Dr. Nickerson.  In addition, in December 1994, Muñiz complained of frequent crying spells and poor

sleep.  Those problems had resolved or improved.  Moreover, her daily activities showed only moderate restrictions.  Dr. Romanik also discussed problems with Muñiz's credibility.  [RP 305-06.]

The SSA found that Muñiz's benefits should be terminated as of August 1, 1999 [RP 124, 126.]  In her request for reconsideration report and interview, dated November 3, 1999, Muñiz complained of back pain, depression, arthritis, hair loss, leg pain and numbness.  She stated that she could dress and bathe herself but seldom did household maintenance.  She was able to read magazines and watch television.  Muñiz seldom saw friends or relatives.  She did not drive and used the bus.  She walked with a hobbled limp.  The interviewer could see she suffered from hair loss.  [RP 214.]     O a November 16, 1999 disability form, Muñiz wrote that about health problems in her family, her hair loss and the medications she was taking.  She stated that she took Hydrocodone, 2-4 tablets, every four hours for pain.  [RP 204.]  Muñiz also was taking Relafen, an anti-inflammatory, and Paxil for depression.  She was taking two to three tablets of Xanax to help her with her fear of being in a crowd or around people while shopping.

On Muñiz's daily activities questionnaire, dated November 17, 1999, she stated she felt tired and weak and needed to rest for an hour after doing anything.  She was unable to walk a block because her left foot hurt and her right leg started to bother her.  She could not go upstairs.  She would need a handrail to walk upstairs but did not use any assistive device.  Muñiz was able to care for herself, but had problems being around people.  She cried if she was criticized and had been in fights with managers at stores.  She was unable to finish anything she began.  Muñiz wrote that she would hit a person when she knew she was right and the other was wrong.  [RP 223.]  With respect to her past work, Muñiz stated that she did not report to work on time, did not have good attendance and could not concentrate.

22

On November 29, 1999, Muñiz filled out a pain report.  [RP 205.]  Her "first pain" was in her back and both legs.  She felt aching, cramping and numbness throughout the day and night.  She complained of numbness in her big toe and stated that her hip started hurting.  The pain medications helped somewhat but not fully.  She had taken Hydrocodone 2-3 times a day since May 1993 according to her statements in this form.  [RP 207.]  Her "second pain" was in her left and right leg.  Her arthritis was worse and she was taking Celebrex for it, but with side effects of an upset stomach.  The "third pain" stemmed from aching and throbbing headaches that she suffered from three times each week for 2-3 hours.  Muñiz stated that she felt more pain and anxiety than ever.  The 1998 back surgery helped a little but not entirely.  She was unable to sleep and hated being around people.  [RP 212.]

It may be worth noting that except for the first few months of 1999, there are no medical records documenting medical care Muñiz received (after March 1999).  Most of the 1999 records are disability-related forms and reports.

### ***2000 Records:***

Muñiz did not show up for a consultative exam scheduled with Dr. Sacks on March 17, 2000.  [RP 18, 142.]  Muñiz's excuse for missing the appointment was found not credible.  Dr. Sack's office reported that she was a "no show."  [RP 318.]

Muñiz was to be seen by Dr. G.T. Davis for a consultative exam on March 20, 2000.  [RP 307.]  She filled out several intake forms for Dr. Davis.  On one, dated March 5, 2000, Muñiz stated that she was having "bad anxiety attacks."  She felt her back would never be the same, and she also suffered from bad headaches.  Her left hand and leg bothered her a lot.  She was clumsy and also did not like being around people.  She reported having had "some sort of cancer in the uterus" at some

point in the past.  Her current issues were anxiety, insomnia, and back problems.  She was taking Xanax, Lortab/Hydrocodone, Paxil, and Relafen.  [RP 315.]  Her daily activities included house cleaning, meal preparation, dish washing, laundry, some shopping, child care, personal care.  She listened to the radio and took walks but had no hobbies.  [RP 317.]

On what appears to be another intake form for Dr. Davis, dated March 19, 2000, Muñiz stated that she smoked, had a lot of back problems and did not feel good being around people.  She suffered from "lots of arthritis down her right leg" and hair loss.  She was able to clean house, prepare meals sometimes with help, wash dishes, and do laundry.  She seldom shopped, but she tried to walk.  She took care of her children (who would have been about 16 and 22 years old then) and was able to take care of her own grooming.  [RP 314.]

On March 20, 2000, Dr. Davis examined Muñiz.  She told Dr. Davis that she was referred by disability services for a back x-ray that day but that because she had another doctor's appointment and was about to leave town that day for Arizona, she might not get the x-ray until she returned from her trip the next week.  [RP 307.]  There are no medical records indicating another doctor's appointment on March 20, 2000.

Dr. Davis noted that Muñiz's primary complaint was her LBP, although she complained of hair loss and depression too.  She felt that her hair loss contributed to her employability.  [RP 308.]  She stated that she had seen two doctors, Dr. Varnado and Dr. Larry Hamner (more recently), and that the doctors prescribed Hydrocodone, Zantac, Paxil, Relafen and Celebrex for her.  There are no medical records from Dr. Hamner.

Muñiz reported to Dr. Davis that she did not like to sit more than 45 minutes before changing positions.  Her leg hurt if she walked more than 1½ blocks.  Her medications were somewhat helpful.

24

Her right side became tender two weeks earlier and she had gone to Dr. Hamner.  Her blood tests

showed she had Hepatitis A and C and maybe D, but there are no corresponding lab results or medical

records in the administrative record.  Muñiz told Dr. Davis that she used IV drugs about 2½  years

ago, which would have been in about 1997.  Dr. Davis noted that Muñiz's gait was normal, her

balance was good, and she would walk on her toes and heels and could squat.  [RP 308.]  Muñiz had

good mobility in her neck and mid-back and good motion in her extremities.  There was no evidence

of muscle spasm or radiculopathy residuals.  However, Muñiz's liver appeared enlarged.  Dr. Davis

stated that with her back surgery (in 1998), she might have some limitation as to heavier or more

strenuous types of activities.  However, Dr. Davis saw no reason for other limitations at this time.  [RP

309.]

On March 30, 2000, there is a radiology report related to Muñiz's lumbar spine x-ray.  The

x-ray was taken because of Muñiz's lifting injury in 1993, back pain and right leg numbness.  The

results showed moderate disc space narrowing at L4-5 with marked hypertrophic changes of adjacent

endplates.  [RP 318.]

On May 9, 2000, a case worker for disability services noted that at the initial continuing

disability review, they had concluded there was no medical improvement.  However, upon

reconsideration, Muñiz failed to attend a scheduled consultative exam.  Because there was insufficient

evidence to adjudicate regarding mental limitations (*albeit* there was "medical improvement from a

physical standpoint"), the case was referred to hearings.  [RP 338.]

On May 10, 2000, Dr. Green provided an "advisory" physical RFC Assessment.  He noted that

Muñiz's primary diagnosis was degenerative disc disease of the lumbar spine and liver dysfunction by

history.  He noted limitations of: occasional lifting of 20 pounds; frequent lifting of 10 pounds;

standing or walking six hours; sitting six hours; unlimited pushing and pulling.  [RP 320.]  The form notes that Muñiz reported substance abuse and alcohol abuse.  Her liver functions were abnormal in January 1999.  She currently had right upper quadrant tenderness.  Upon exam, there was a positive finding of flexion of lumbar spine to 40 degrees.  Dr. Green noted that the x-ray indicated moderate disc space narrowing with marked hypertrophic changes.  He further concluded that the findings and Muñiz's pain were consistent with this assessment.  Dr. Green found occasional postural limitations in all categories.   He also found that the severity or duration of Muñiz's symptoms was disproportionate to the expected severity or expected duration on the basis of her  medically determinable impairments.  [RP 324.]  In support of that finding, Dr. Green commented that she had denied substance abuse issues and then admitted them.  She had manipulated her physicians for prescriptions in the past.  "Credibility is a major issue."  [RP 324.]

On May 17, 2000, Dr. Gabaldon attempted to fill out an "advisory" psychiatric review technique form.  [RP 327.]  The doctor stated there was insufficient medical evidence to show medical disposition.   Muñiz alleged depression but had not pursued psychiatric or psychological treatment/therapy.  She admitted to a history of IV drug abuse and was caught trying to sell prescriptions and continued to change doctors to obtain Hydrocodone.  Her last exam of June 1999 indicated depression with possible anxiety and agoraphobia but there was no subsequent medical information because of Muñiz's failure to attend the psychiatric consultative exam in 2000.  Thus, there was insufficient evidence to assess her current mental condition and Dr. Gabaldon was unable to evaluate the rate of impairment severity.  [RP 334.]

On June 20, 2000, there was a hearing before a disability officer, but Muñiz failed to appear.  She had been notified of the hearing date well in advance.  [RP 142.]  The hearing officer intended to

address Muñiz's recent application for SSI in addition to the question of medical improvement. The officer did not find good cause to reschedule the hearing or to reschedule another psychiatric exam. Thus, the officer proceeded with the hearing by summarizing and analyzing Muñiz's history. [RP 141.] The hearing officer concluded that, based on the total evidence in the file, there was no indication of "any significant improvement" regarding Muñiz's back condition but that she was unable to determine if there was medical improvement regarding Muñiz's depression. [RP 142.] Without more information, the officer concluded that Muñiz was not disabled. [RP 145.] Therefore, Muñiz's request for reconsideration was denied. [RP 448.] The decision to terminate Muñiz's benefits was affirmed. [RP 125.]

On August 21, 2000, Muñiz filed a request for an ALJ hearing. On the form, she wrote that she had additional evidence showing she had Hepatitis A and C. She also stated that "the letter" (possibly the prior notice of hearing) was sent to the wrong address. [RP 146.]

Again, it may be noteworthy that no treating physician's medical records were made part of the administrative record in 2000. There is a single x-ray report taken in conjunction with a consultative exam.

### *2001 Records:*

In 2001, Muñiz began seeing Dr. Robin Hermes for pain treatment. She stated that she had seen Dr. Mancha who had obtained an MRI and had referred Muñiz for pain treatment. There are no medical records from Dr. Mancha.

On April 4, 2001, Dr. Hermes' Medical Pain Evaluation shows Muñiz's primary complaint to be left-sided leg pain. She had a history of left-sided lower extremity pain that started in 1993. In 1995, she stated she underwent a laminectomy with alleviation of her pain until about two years ago

(it seems that the surgery occurred in 1998). Muñiz reported that she felt a gradual return of the pain, and that it radiated toward her hip and down her leg. At times, it was a stabbing pain. Lying down helped with the pain. Muñiz also had numbness and weakness. She frequently suffered from insomnia, depression and anxiety that she felt was secondary to the pain. Muñiz stated that she underwent physical therapy years ago without any help. Acupuncture was not helpful, and trigger point injections were temporarily helpful. She normally took Hydrocodone for pain. [RP 359.] She listed her medications, in addition to Hydrocodone, as Xanax and Paxil. Muñiz reported that she rarely drank alcohol and had smoked about one pack of cigarettes for 20 years.

Dr. Hermes noted that Muñiz exhibited no pain behavior on exam. [RP 360.] Muñiz walked without assistance and could do the heel and toe walk. She exhibited tenderness over the left lumbar paraspinous muscle. She could perform flexion to 60 degrees before experiencing back pain. Her strength was normal. She exhibited pain while sitting with a straight left leg raise. A March 12, 2001 MRI (presumably ordered by Dr. Mancha but not part of the record), indicated a small focal herniated disc at L5-S1, unchanged from the 1998 study. The larger herniation at L4-5 was no longer shown. Dr. Hermes diagnosed her with a small L5-S1 herniated disc, left sided lumbar radiculopathy. She intended to try Muñiz on a trial of transforaminal lumbar epidural steroidal injections and a trial of Neurontin. Muñiz stated she was not taking any anti-inflammatory medication. A trial of Vioxx was also provided. Dr. Hermes wrote that for now Muñiz remains on Hydrocodone; however, the doctor wanted Muñiz to try to reduce Xanax and asked her to decrease it by 1.5 pills per day. [RP 360.]

On July 22, 2001, Muñiz was seen by Dr. Heck at the Lovelace Emergency Room for abdominal pain. Muñiz said she had experienced intermittent flank pain for 8 months with increasing discomfort. The pain occurred one time per week and usually at night, was sharp and extended into

her back.  She described symptoms similar to gall bladder problems.  Muñiz reported that she was taking Hydrocodone twice daily until the last three weeks when she ran out of the medication.  She was also taking Xanax for anxiety.  She denied alcohol use.  Muñiz exhibited mild to moderate right lower quadrant discomfort on exam, which was consistent with right ovarian pain.  The medical record notes bacteruria and chronic pain syndrome.  [RP 407.]  Muñiz was stable when discharged.  The record indicates that she felt minimal relief from Toradol[22] in the ER but was more comfortable with Demerol.[23]  The ER doctor believed Muñiz was between doctors and that she had chronic pain issues.  Muñiz denied taking any pain medications currently.  She was given a small prescription of Vicodin for use with severe pain.  Muñiz did not wish to take Ibuprofen because of stomach problems.  Dr. Heck thought her symptoms were inconsistent with an appendicitis.  It was possible she had a kidney stone, but the doctor hoped that the ultrasound would provide answers.  [RP 406-409.]  There are no subsequent medical records indicating Muñiz had an ultrasound.

About 11 days later, on August 1, 2001, Dr. Heck again treated Muñiz in the ER.  This time, Muñiz complained of right ankle pain, stating she had fallen into a pothole on the day before twisting her right ankle.  She presented with pain and swelling to the ankle.  An x-ray showed fractures of both the medial and lateral malleoli.  [RP 404.]  Muñiz was placed in a splint and given crutches.  She also received prescriptions of Vicodin, Demerol and Vistaril.[24]  Dr. Heck instructed Muñiz not to place

---

[22]Toradol or Ketorolac is used for the short-term treatment of moderate to severe pain in adults, usually after surgery.  www.webmd.com

[23]This medication is a narcotic analgesic used to relieve moderate to severe pain.  www.webmd.com

[24]Vistaril or "Hydroxyzine is used for the short-term treatment of nervousness and tension that may occur with certain mental/mood disorders (e.g., anxiety, dementia). It is also used to treat itching from allergies and other causes (e.g., reactions to certain drugs). It may also be used to help you feel calmer before/after surgery, or to help certain narcotic pain relievers (e.g., meperidine) work better."  www.webmd.com

weight on her lower right extremity and to leave on the splint until a follow-up appointment.  The notes also indicate Muñiz was given a prescription for Percocet "to use as needed for pain."  [RP 405.] Dr. Heck made no mention in this record of her previous treatment of Muñiz just 11 days before.

On August 3, 2001, Muñiz saw Dr. Thomas McEnnerney at Lovelace.  Muñiz was admitted one day for surgery on her ankle for "open reduction internal fixation of right ankle."  [RP 362, 364.] Muñiz was discharged with a prescription of Percocet.  She was instructed to take the pain medication every 4-6 hours for pain.  [RP 362.]  She was to schedule a follow-up appointment 7-10 days later. This record also indicates that Muñiz denied alcohol or substance abuse.  [RP 366.]

An August 3, 2002 chest x-ray indicates surgical clips in the right upper quadrant of Muñiz's abdomen but there were no significant abnormalities shown.  [RP 368.]

At 11 p.m. on August 9, 2001, Muñiz called Dr. McEnnerney stating she was having a difficult time sleeping due to ankle pain.  She mentioned her fall and that she was using her pain medications very rapidly.  The record indicates that Dr. McEnnerney noted Muñiz spoke with slurred speech.  He asked her to come in on the follow day.  [RP 379.]  On August 10, 2001, Muñiz saw Dr. McEnnerney. She complained of right ankle pain and said she had consumed almost all of the Roxicet that was prescribed postoperatively.  She had been taking it at a great rate.  Dr. McEnnerney wrote that "[Muñiz] is chronically disabled from multiple problems so that it somewhat to be expected" (apparently referring to her use of pain medications).  [RP 377.]  He further stated that the wound looked good and that Muñiz had a "very low pain tolerance."  He gave her a prescription of Roxicet #60 with no refills.  She was also instructed to take 800 mg. of Ibuprofen three times a day which she had been doing.  Dr. McEnnerney also wrote that he had given Muñiz's husband a note stating he

should be excused from work for nine days to assist Muñiz in her postsurgical recovery, yet there was no evidence that Muñiz's husband worked. [RP 377.]

On August 13, 2001, Muñiz again saw Dr. Hermes for a lumbar epidural steroid injection. Dr. Hermes noted that since seeing Muñiz in April 2001, Muñiz had "been off Xanax and Vioxx; she never did try Neurontin."  [RP 384.]  Currently, Muñiz was taking Percocet for pain related to her recent ankle fracture and repair.  Muñiz asked Dr. Hermes for a refill of the Xanax, and Dr. Hermes suggested a trial of nortriptyline rather than reinstituting a benzodiazepine.  [RP 384.]

On August 21, 2001, Muñiz returned to Dr. McEnnerney.  The ankle incision was healing well. Muñiz, however, complained of more pain.  The doctor placed her in a short leg cast which she was to stay in for several more weeks.  He prescribed her Roxicet #40 with expectations that it would last her while she was in the cast.  Dr. McEnnerney noted that Muñiz had numerous medical problems for which she was taking a great deal of pain medication but he did not think she should have a significant amount of discomfort from the ankle.  [RP 375.]

On September 5, 2001, Muñiz showed up for the first of several continued ALJ hearings.  She was without an attorney, and Judge Morris continued the hearing so that she could obtain counsel. [RP 39.]

On September 7, 2001, Muñiz again saw Dr. McEnnerney.  She came in without the cast and was using crutches.  She complained of significant pain.  He placed her back into a short leg cast and wanted her to place no weight on the ankle for another three weeks.  She asked for more pain medication and was given Darvocet.  However, the record notes that Muñiz was "vehement" that she should receive Roxicet.  Dr. McEnnerney explained that he did not believe she should need a narcotic pain killer a full four weeks after surgery.  [RP 373.]

31

On September 12, 2001, Muñiz saw Dr. Hermes for another epidural injection.  She felt the injections were quite helpful.  However, Muñiz complained of pain and difficulty sleeping because of spasms in her left foot and leg.  She wondered if there was a medication that Dr. Hermes could give her in sample form that might help.  Muñiz stated that she ran out of her medications, including Paxil, a few days ago.  Dr. Hermes refilled her prescriptions for Nortriptyline and Percocet.  She gave her samples of Zanaflex and Zoloft.  [RP 383.]

On October 1, 2001, Muñiz saw Dr. McEnnerney again for a follow-up on her right ankle. She was ambulating without the cast despite being told to remain non-weight bearing.  She did not have an appointment that day and had missed her appointment on the previous Friday.  The cast was in extremely poor repair, but the xray showed acceptable alignment and position with excellent healing. Dr. McEnnerney advised Muñiz to exercise and sent her to physical therapy.  [RP 371.]  There are no physical therapy records to show that she engaged in any type of therapy at this point.

On October 18, 2001, the ALJ hearing was again scheduled, and Muñiz again showed up without an attorney.  Judge Morris continued the hearing.  [RP 41.]

On October 30, 2001, Muñiz saw Dr. Hermes and received another epidural injection.  Muñiz was taking Percocet, two per day, Zoloft, 50 mg a day, Nortriptyline, 10-20 mg a night, Skelaxin, 800 mg, one to two times a day and Zanaflex, 2 mg. at night.  [RP 381.]  It does not appear that Muñiz received any refills during this visit.

On November 19, 2001, Muñiz called Dr. McEnnerney complaining that the pins in her right ankle were uncomfortable.  She had been told that if they became uncomfortable she might need to have them removed.  [RP 395.]

On December 4, 2001, Muñiz showed up for the third ALJ hearing, again without an attorney. A different ALJ continued the hearing to give Muñiz time to find an attorney.  [RP 50.]   On December 18, 2001, Dr. McEnnerney saw Muñiz related to her complaints about the hardware under the skin.  She was taking Percocet as needed.  She stated she intended to stop smoking that day.  Dr. McEnnerney wanted to wait several months before scheduling another surgery to remove the hardware.  [RP 390.]

Muñiz saw Dr. Hermes on December 26 for another injection.  She stated she had been "virtually pain free" for one month, but that her pain had recently returned.  [RP 420.]  She was out of Percocet.  She told Dr. Hermes that she was taking 2 tablets of Percocet a day, but Dr. Hermes reviewed her chart and saw that Muñiz must have been taking Percocet at least four times per day. Muñiz admitted this but said the Percocet was quite helpful for the worst of her pain, "which is her ankle."  Muñiz was to continue her use of Percocet, Zoloft, Nortriptyline, Skelaxin and Zanaflex.  Dr. Hermes had Muñiz sign a "narcotics contract" describing the use of narcotic medications and requiring Muñiz to be honest about her use.  Muñiz agreed.  [RP 420.]

On February 19, 2002, Muñiz had the hardware removed from her ankle.  The medical record indicates that Muñiz was positive for Hepatitis A and C, although there is no actual objective evidence of this diagnosis.  Muñiz was taking 4 Percocet tablets per day.  [RP 398.]  She checked the box "yes" that she had been a prior IV drug user.  Muñiz was discharged from the surgery with a prescription of Roxicet #30.  [RP 402.]

It appears that on February 20, 2002, Muñiz called the pharmacy about her concern that she might run out of Roxicet even though she wished to increase the use of the medication.  [RP 393.]

On February 22, 2002, Muñiz called Dr. McEnnerney stating she had run out of Roxicet.  He called in a prescription of Vicodin #50 with no refills with the expectation that it would last through her recovery period.

On April 9, 2002, Muñiz saw Dr. Hermes.  Muñiz had not shown up for a prior scheduled appointment in March.  However, she had called in that day to request refills on her Percocet.  [RP 418.]  She was not provided with the refill by Dr. Hermes.  Overall, Muñiz stated that she was not doing well.  She also said she was currently not taking any pain medications.  Muñiz stated that she needed a psychiatrist and had not been under the care of a psychiatrist for some time.  Dr. Hermes gave Muñiz some free samples of Zoloft.  She also noted that while Muñiz stated she was unable to afford her medications, she paid for Percocet prescriptions.  Dr. Hermes' notes are copied to Dr. Victor Mancha.  However, there are no medical records from Dr. Mancha's office relating to treatment of Muñiz.  [RP 418-19.]

On April 16, 2002, Muñiz presented at Presbyterian's ER triage.  She complained of LBP and right ankle pain.  She listed Dr. Hermes as her PCP.  She was given a prescription of Percocet.  [RP 435.]

On April 17, 2002, Muñiz was seen by Dr. Mark Sauerman at Lovelace ER for right ankle pain.  She stated that she used to be on Percocet but no longer was taking it.  She denied illicit drug use or alcohol use.  Dr. Sauerman noted that she could use Tylenol or Ibuprofen as necessary.  [RP 386.]

On May 8, 2002, Dr. Hermes gave Muñiz another injection.  She noted that Muñiz was on Percocet, Zoloft, Zanaflax, Skelaxin.  She was accompanied by her son that day and was ambulating slowly.  [RP 415.]

On July 9, 2002 and July 17, 2002, Muñiz was seen at Presbyterian ER triage for complaints of LBP. On July 9, she was given prescriptions for Vicodin #20 and other medications that are not legible on the record. [RP 431.] On July 17, it appears that she was given another prescription for Vicodin #25. [RP 427-28.] One of these records notes that Muñiz had a past history of Hepatitis A and C, a history of drug abuse and an anxiety disorder. [RP 432.] The other record appears to state that Muñiz was in recovery from some sort of addiction (perhaps narcotics) in June 2000. [RP 428.] The record is difficult to read.

Muñiz saw Dr. Hermes on July 25, 2002. Muñiz stated that the epidurals were not helping as much now. Dr. Hermes noted that she had suggested Muñiz be seen at UNM (probably related to Muñiz's ongoing anxiety) but that "for whatever reason that has never happened." [RP 413.] Dr. Hermes documented that she had given Muñiz samples of certain medications because Muñiz could not afford them but stated that Muñiz "either does not tolerate them or does not take the medications regularly." The only medication that Muñiz could take consistently was Percocet, and Dr. Hermes noted that they had discussed she should not escalate the use of that drug on her own. Muñiz complained of severe pain and had been taking Percocet up to 3 times a day. Dr. Hermes noted that she did not wish Muñiz's only intervention to be Percocet and told her this. Dr. Hermes prescribed physical therapy and told Muñiz that she expected Muñiz to take a more active role in her own medical improvement. Dr. Hermes wanted Muñiz to pursue treatment at UNM aggressively because Dr. Hermes believed that her anxiety played a role in worsening her symptomatology. [RP 413.] Muñiz requested medications for sleep. Dr. Hermes gave her Elavil. She noted that Muñiz was a "no show" for her last appointment.

On August 28, 2002, Muñiz was again seen at Presbyterian ER for right ankle pain.  She obtained a prescription for Percocet.  Interestingly, she listed Dr. Hermes again as her PCP.  Muñiz needed pain medication because she slipped on a wet floor.  [RP 425.]

***2003 Records:***

On March 18, 2003, ALJ William Nail conducted the hearing, at which Muñiz was present and represented by counsel.  [RP 55, 57.]  Judge Nail discussed Muñiz's prior award of benefits and medical conditions.  Muñiz first noted that she sometimes used a cane and that she was unable to work at present because of back problems.  [RP 62.]  She stated that she had last had surgery on her back in 1995 (although it appears to have been in 1998).[25]  She further noted that she had three ruptured discs, that her back still dislocates and she feels she needs another back surgery.  [RP 66.]  Later, she testified that she thought she had an MRI through Dr. Hermes that indicated three ruptured discs.  [RP 75.]  Judge Nail stated that his review of the MRI report indicated that her back was mostly unchanged from the 1998 results (when she had surgery), and that she had only a small focal herniation.  [RP 76.]

Muñiz traveled to the hearing by bus that day and stated she had not taken any trips, did not visit with family or friends, and did not go out to do anything.  Later, during the hearing, Muñiz admitted that she had traveled to Arizona and visited friends.  [RP 68, 92, 105.]  During the day, she only read the bible and watched TV.  She did some cooking, but no outside work.  Muñiz did not do any ironing, laundry, or shopping, although her testimony varies during the hearing.  [RP 69, 70, 82.]  She could take care of her personal needs and feed herself, but she had a hard time putting on her

---

[25]Muñiz's attorney attempted to clear up the date of her back surgery, but she stated she never had a discectomy in 1998 [RP 78], contrary to the records, i.e., Dr. Johnson's 1998 surgery.

shoes.  Her sleep was not too good, and she could only watch TV for a 20 minute interval by sitting

in a recliner chair.  [RP 70-72.]  She washed dishes but only by using a chair to prop her left foot up

while washing.  She could not walk far, but she admitted she had to walk a block from the bus stop

to the hearing that day.  [RP 72.]  While she walked to the hearing that day [RP 80], she walked very

slowly and her back was hurting.   Muñiz was unable to lift any amount of weight, not even a gallon

of milk.  She could not bend over, squat or go up and down stairs.  [RP 74.]

Muñiz further explained that she could not sit as long in a regular chair as she could in a

recliner.  [RP 78.]  However, it was observed that she had been sitting in a regular chair at the hearing

for 20 minutes at that point, and that she had not moved around.  Muñiz testified that she felt pain and

a numbing sensation in her lower back that traveled down her leg.  [RP 79.]  She also felt a stabbing

pain then on the bottom of her foot and pain in the left side of her body.  At the end of the hearing,

the ALJ noted that Muñiz had sat in a regular chair for an entire hour.  Her attorney stated that she

had shifted positions.  [RP at 105.]

Muñiz testified that for most of the day, i.e., nine hours, she lay down.  [RP 82.]  She felt a

great deal of anxiety as well and did not like being around people.  As soon as she entered a grocery

store, she wanted to leave.  She felt depressed and started crying frequently, although she hid her

crying from her husband.  [RP 85.]

Muñiz was not taking medications presently for her depression because she wanted "to do it

on her own" and the drugs were too expensive.  She said she suffered from "really bad" anxiety and

depression, and saw Dr. Hermes every three months.  Muñiz did not see a psychologist.  She smoked

less than a half of a pack of cigarettes each day.  She did not drink or use illegal drugs, but was

presently taking Percocet.  [RP 74.]  Muñiz later admitted during the hearing that she had used intravenous drugs "a long time ago."  [RP 92.]

Muñiz stated that she had an appointment with Dr. Hermes on April 30, but there is no corresponding medical record.  [RP 88.]  She was not stretching or engaging in exercise.  She had no physical therapy referral (although the record indicates she had received several such referrals).  [RP 89, 90.]  Muñiz testified that she presently felt the same or worse than she did when she was awarded disability benefits in 1994.

When asked about her failure to attend the consultative examination with a psychiatrist, Muñiz stated she did not recall.  [RP 92.]  She also did not recall the other doctors who examined her for disability services, including Dr. Sacks and Dr. Davis.  [RP 93.]

At the hearing, Muñiz's husband testified that he stayed at home to care for his wife, and that Muñiz's daughter remained at home to take care of her mother as well.  [RP 97.]  The daughter was looking for work, according to her stepfather.  [RP 97.]

A vocational expert testified at the hearing.  The ALJ presented the VE with the following hypothetical:  "If we were to consider . . . a person of the age, educational background and experience of [Muñiz] we were defining that she was limited to 20 pounds occasionally, 10 pounds frequently, that no excessive standing or walking, opportunity to alternate sit and stand, no climbing, no stooping, squatting or crawling.  This work needs to be relatively simple, one or two step processes."  The VE testified that under those limitations, Muñiz could not return to her past relevant work.  However, there were jobs in the economy that she could perform.  [RP 101-02.]

Muñiz's attorney then questioned the VE and provided the additional limitation that Muñiz was unable to sit for more than 20 minutes or stand for more than three minutes at a time, and unable to

lift more than 5 pounds.  [RP 103-04.]  The VE testified that the additional limitations would eliminate the cashiering positions but not the ticket seller or final assembler of eyeglasses.  However, if Muñiz needed to lie down during the day, all jobs would be eliminated.  [RP 104.]  Muñiz's attorney also asked the VE to consider someone with psychological problems who had a marked limitation in her ability to relate to other people.  The VE testified that limitation would eliminate all jobs.  [RP 105.]

At the end of the hearing, Muñiz's attorney pointed out that one of the disability records indicated there was no medical improvement and yet the agency continued to find her benefits properly terminated.  [RP 106.]  The ALJ explained that they had been unable to adequately evaluate Muñiz because of her failure to attend the consultative exam.  The attorney argued that the denial of benefits was not primarily due to her failure to attend the consultative exam, and attempted to argue that the side-by-side comparison prepared by disability services showed no medical improvement in the physical area.  [RP 107.]  The side-by-side review [RP 343] shows that there was a finding of MI with respect to Muñiz's physical capabilities but that the agency was unable to assess her mental condition because she did not attend the consultative exam.  [RP 344.]  The ALJ ended the hearing by stating his belief that Muñiz should not have been granted benefits in the first place.  [RP 107.]

There is a letter, dated April 18, 2003, from Muñiz's attorney Chris Garcia to ALJ Nail.  [RP 422.]  The letter was accompanied by medical records from Dr. Hermes' office from December 26, 2001 to July 25, 2002.  Attorney Garcia explained that there were no records from Dr. Hermes after July 2002 because even though Muñiz continued to get her pain medications from Dr. Hermes, she did not need to go into the office to obtain the prescriptions.  Thus, there were no written records after July 2002 from Dr. Hermes.  Based on the Court's review of Dr. Hermes' thorough documentation of Muñiz's treatment, in addition to Dr. Hermes' clear indication that she was not willing to provide

Muñiz with ongoing prescriptions for Percocet and requirement that Muñiz adhere to a written "narcotics contract", it is unbelievable that Dr. Hermes was merely calling in prescriptions for pain medication without documenting such prescriptions.  [RP 422.]

On July 25, 2003, Judge Nail issued a written decision affirming cessation of Muñiz's benefits and denying a request for SSI benefits.  On September 25, 2003, Muñiz filed a request for review, stating that she did not believe she had had a fair hearing.  She also wrote that she was going to get a primary doctor "at BCMC and a back specialist doctor and a doctor for my anxiety."  [RP 10.] There are no medical records indicating Muñiz obtained this medical care and no subsequent medical records from any provider.

### Muñiz's Motion

Muñiz asserts first that the ALJ was "looking for a way to deny benefits to Ms. Muñiz" because of his statement at the hearing that the ALJ did not believe Muñiz should have received benefits in the first place.  Next, Muñiz claims that the ALJ erroneously relied on the VE's testimony in support of his decision.  More specifically, Muñiz argues that the ALJ committed three errors related to his RFC finding and hypothetical to the VE.  First, the ALJ ignored Muñiz's difficulty interacting with others.  Second, the ALJ failed to reconcile inconsistencies between the VE's testimony and the description of jobs in the DOT.  Third, the ALJ's question to the VE was vague. Muñiz concludes that the ALJ failed to show, as he must, that Muñiz's condition had improved to the point that she was able to work.  [Doc. No. 12.]

The Commissioner responds that there was substantial evidence to support the decision  that Muñiz experienced medical improvement relating to her ability to work as of August 1, 1999. Contrary to Muñiz's position, the ALJ properly analyzed Muñiz's subjective complaints and

discounted them for legally sufficient reasons. The ALJ properly considered Muñiz's physical limitations and mental functioning in assessing the RFC and posed a complete hypothetical question to the VE. Thus, the Commissioner urges that the decision should be affirmed. [Doc. No. 13.]

### Discussion

This case is complicated for a number of reasons: its procedural posture (with medical improvement being determined, along with Muñiz's subsequently filed SSI application); notes in disability records indicating inconsistent findings by consultative physicians regarding medical improvement; difficulties in understanding Muñiz's medical history, dates of employment, and precipitating causes of her injuries; widely varying and contradictory testimony by Muñiz regarding her daily activities, limitations, primary medical problems, prescription drug use, and substance and alcohol abuse; Muñiz's failure to attend consultative examinations; the six-year passage of time between the determination to cease Muñiz's benefits and the Appeals' Council's denial of the request to review; lack of medical records from certain medical providers, along with unsubstantiated diagnoses to which Muñiz referred; allegations that ALJ was biased based on his statement at the hearing that he did not believe Muñiz should have been awarded benefits in the first place; and the fact that while certainly Muñiz suffered from a prescription drug addiction, she also suffered from, at a minimum, documented medical conditions, including a herniated disc that required back surgery in 1998.

Notwithstanding the challenges this case presents, at this stage of the proceedings, the Court limits its examination to whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.

### A.   Hypothetical to Vocational Expert

Muñiz argues first that portions of the ALJ's hypothetical to the VE were impermissibly vague, to the extent that the VE's response to the questions could not provide substantial evidence for the ALJ's ultimate finding of no disability.  The ALJ's hypothetical to the VE was this:

> If we were to consider . . . a person of the age, educational background and experience of [Muñiz] we were defining that she was limited to 20 pounds occasionally, 10 pounds frequently, that no excessive standing or walking, opportunity to alternate sit and stand, no climbing, no stooping, squatting or crawling.  This work needs to be relatively simple, one or two step processes.

Muñiz challenges the portions of the hypothetical that she could not perform "excessive standing or walking" and that she be allowed the "opportunity to alternate sit and stand."  She argues that when an RFC assessment includes a requirement that a claimant alternate between sitting and standing, the ALJ must be specific regarding the frequency of the need to make adjustments in position, which Judge Nail did not do.  In support of her position, Muñiz relies on Armer v. Apfel, 216 F.3d 1086 (Table), 2000 WL 743680 at *3 (10th Cir. Jun 9, 2000).

In Armer, the Tenth Circuit remanded for an award of immediate benefits.  In so ruling, the Court concluded, *inter alia*, that the ALJ's finding that the claimant would have to change positions from time to time to relieve his symptomatology was vague, and that the ALJ erred by failing to make specific findings assessing the extent of the claimant's manipulative impairments and his ability to sit, stand and walk.  Id. at *3.

Armer is distinguishable from this case on a number of grounds.  For example, in Armer,  the ALJ concluded that the claimant had the RFC for unskilled sedentary work.  Because most unskilled sedentary jobs require good use of both hands and the fingers, the claimant's asserted manipulative impairments were critical to assessing his claim.  The ALJ did not make specific findings as to the

claimant's manipulative impairments and instead made a general finding that the claimant had "residuals" from carpal tunnel syndrome, without saying what the "residuals" were.  Also significant was the ALJ's reliance on the results of a consultative exam showing that the claimant had good dexterity in his hands, but where an RFC assessment was not performed, even though the regulations require such findings for a complete consultative examination.

In addition, in Armer, the ALJ made no specific finding about the claimant's ability to sit, stand or walk.  Yet, Armer's treating physician opined that Armer was "still unable to sit for any length of time."  Thus, in that case, the ALJ committed error on a number of grounds, with the result that there was insufficient evidence in the record to demonstrate that the claimant could perform sedentary jobs.

Here, the ALJ determined that Muñiz had the RFC for a limited range of light work.  In so finding, he relied on a number of medical records and examinations.  [RP 18, 20.]  Ms. Pasternacki found Muñiz had limitations in 1998, postoperatively, but stated the limitations, including no prolonged sitting or standing, were in effect for only two months.  Dr. Davis conducted a consultative exam in March 2000, observing that Muñiz could walk on her toes and heels and squat down.  She had good mobility in her neck and mid-back.  Her gait was normal and her balance was good.  She was precluded from only strenuous activities.  He saw no reason for other limitations then.

Muñiz reported to Dr. Davis that "she doesn't like to sit more than 45 minutes before she changes positions."  [RP 308.]  She further said that when she rolled out tortillas she sat down because it was uncomfortable to stand in one position.  Her own description of limitations does not reflect that she was unable to alternate between sitting and standing.

The ALJ noted Muñiz's testimony at the hearing that she could sit only 20 minutes at a time and stand only three minutes.  However, for ample reasons, the ALJ explained why he found Muñiz's

allegations of her functional limitations to be not fully credible.  For example, the ALJ noted Muñiz's daily activities, including her ability to do some housework, wash dishes, sweep, prepare meals, ride a bus, walk to the hearing, and sit for an hour during the hearing without standing.

Moreover, there is substantial evidence in the record to support the ALJ's finding that Muñiz was not as limited as she claimed and furthermore, to support the hypothetical to the VE that Muñiz was not limited in her ability to stand, walk and/or sit except to the extent that she not have to stand or walk "excessively" and that she be permitted to alternate between sitting and standing.  For example, in 1999, Muñiz reported that she could prepare breakfast for herself and husband, do light household work and go the laundromat.  She watched television.  [RP 281.]

The 1999 and 2000 Physical RFC Assessments both indicated that Muñiz could sit, stand or walk up to six hours per day.  In 2000, she filled out forms stating that she could clean house, prepare meals with help, wash dishes and do laundry.  She was able to care for herself and her children.  In addition, in 2000, Muñiz was able to travel to Arizona from New Mexico to visit friends.

In 2001, when seen by Dr. Hermes, Muñiz exhibited no pain behavior upon exam.  [RP 360.] She walked without assistance and could do the heel and toe walk.  Studies indicated Muñiz had only a small herniated disc and that the larger herniation had been resolved by the 1998 surgery.  Even after an ankle fracture and surgery, Muñiz chose to ambulate without a cast, despite being told to remain non-weight bearing.

Finally, while not conclusive as to the question of Muñiz's physical limitations, it is noteworthy that not a single treating physician or ER doctor, during Muñiz's numerous visits, noted a permanent or lengthy restriction regarding her ability to sit, stand or walk.  Indeed, none of them documented that they observed Muñiz was unable or uncomfortable when walking, standing or sitting.  The Court

agrees with Defendant that while Muñiz made these allegations regarding her limitations, the restrictions are not supported by the objective evidence, and furthermore are often contradicted by her own activities.

The ALJ need only provide the VE with limitations that the ALJ finds are established by the record evidence. Baldwin v. Barnhart, 2006 WL 337585 at *6 (10th Cir. Feb. 14, 2006); Shepherd, 184 F.3d at 1203. The Court determines that the challenged portions of the hypothetical to the VE are not impermissibly vague,[26] that substantial evidence supports the limitations provided in the hypothetical, and that the ALJ committed no error with respect to the hypothetical. Therefore, the Court rejects Muñiz's position that the VE's responses to the hypothetical cannot be considered substantial evidence supporting the ALJ's ultimate conclusion.

### B.   Inconsistencies Between VE Testimony and Dictionary of Occupational Titles ("DOT")

Muñiz claims there were discrepancies between her stated abilities and two of the occupations identified by the VE (Cashier II and ticket seller). Both identified occupations require a reasoning level of three, contrary to the hypothetical to the VE that included a restriction that the person be limited to "repetitive, one or two step activities." In other words, Muñiz asserts that a reasoning level 3 is inconsistent with the RFC of someone who is limited to simple, routine tasks.

The Tenth Circuit's decision in Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) supports Muñiz's position. In Hackett, the plaintiff similarly contended that the ALJ failed to reconcile

---

[26]Even if the Court were inclined to find the hypothetical vague, Muñiz's attorney provided the VE with further hypothetical restrictions, including Muñiz's purported inability to sit more than 20 minutes or stand more than 3 minutes. Even then, these restrictions did not eliminate all work that Muñiz could perform according to the VE. Moreover, the ALJ clearly considered and rejected those additional restrictions because they were unsupported by objective medical evidence and/or contradicted by evidence in the record, including Muñiz's own activities and statements.

the VE's actual testimony with the DOT.  Id. at 1175-76 (*citing* Haddock v. Apfel, 196 F.3d 1084 (10th Cir. 1999) and S.S.R. 00-4p, 2000 WL 1898704).  The Tenth Circuit noted its holding in Haddock:  "before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his . . . testimony as to the exertional requirement of identified jobs corresponds with the DOT, and elicit a reasonable explanation for any discrepancy on this point."  Id. at 1175.  The Tenth Circuit further explained that Haddock addressed both exertional and skill-level limitations that conflicted with the DOT.  Id.  Similarly, S.S.R. 00-4p requires a "reasonable explanation for conflicts between a VE's testimony and the DOT relating to any 'occupational information.'"  Id. (internal citation omitted).

In Hackett, the VE identified several jobs that the expert believed the claimant could perform.  The DOT described both positions as requiring a reasoning level of three, "defined as the ability to 'apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [,and d]eal with problems involving several concrete variables in or from standardized situations."  Id. at 1176 (internal citation omitted).  In Hackett, the ALJ found that the plaintiff's RFC included "levels required for simple and routine work tasks."  The Tenth Circuit found that "[t]his limitation seems inconsistent with the demands of level-three reasoning."  Id.  Level two reasoning "requires the worker to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations."  Id. (internal citation omitted).  The Court concluded that it must reverse this portion of the ALJ's decision and remand so that the ALJ could address the apparent conflict between the plaintiff's inability to perform more than simple and repetitive tasks and the level-three reasoning required by the identified jobs.  Id.

In this case, Judge Nail concluded that Muñiz's mental limitations were consistent with her ability to "perform simple, unskilled work." [RP 21.] In so finding, the ALJ relied primarily on Dr. Sacks' 1999 examination and evaluation of Muñiz's mental condition. Dr. Sacks stated that Muñiz appeared to be experiencing a major depression that was recurrent. She also exhibited an element of anxiety with "perhaps mild agoraphobia." [RP 281.] Dr. Sacks concluded that Muñiz could "understand and follow basic instructions. She could probably maintain the attention required to perform simple and repetitive tasks and somewhat more complex tasks." [RP 281.] (emphasis added).

The VE testified that based on the hypothetical limitations, Muñiz could perform the job of Cashier II, D.O.T. 211.462-010. The general educational development required for the position was a reasoning level three, a math level two and a language level two. The worker would need to write compound and complex sentences. The second position identified by the VE, ticket seller, D.O.T. 211.467-030 set forth the same general educational requirements provided for the Cashier II position. The third position identified, final assembler of eyeglasses, apparently does not require a reasoning level three. However, Muñiz urges that one job is not sufficient evidence upon which to base a finding of no disability.

The Commissioner argues that the Tenth Circuit in Hackett merely said that the limitation of simple, routine work tasks "seems" inconsistent with the demands of level three reasoning. While that is true, the Court does not find that argument compelling. In Hackett, the Court proceeded to remand on the basis that there were unexplained inconsistencies between the VE's testimony and the DOT.

The Commissioner also asserts that other record evidence and Muñiz's own testimony support a finding that she can perform more than just simple and repetitive tasks. Notwithstanding the possible

47

truth of that analysis, ALJ Nail found that Muñiz was limited to performing simple, repetitive tasks, and provided that limitation as part of the hypothetical to the VE.

The Court concludes that reversal is appropriate in this case because there were discrepancies between Muñiz's abilities, as stated by the ALJ, and the requirements of two of the three identified positions. Upon remand, the ALJ must ask the VE how his or her testimony as to the exertional and/or skill-level requirements of identified jobs corresponds with the DOT, and elicit a reasonable explanation for any discrepancies.

Moreover, the Court is concerned that the ALJ had only a 1999 psychological evaluation of Muñiz upon which to rely. [RP 18.] In addition, Dr. Sacks' 1999 evaluation was somewhat equivocal regarding what skill level or work abilities he believed Muñiz possessed. The Court recognizes that Muñiz was scheduled for a more current evaluation that did not take place due to Muñiz's own fault. Nonetheless, the Court cannot conclude that substantial evidence supports the ALJ's finding of medical improvement as to Muñiz's mental limitations based on such a dated and somewhat equivocal evaluation. This of particular concern here where Muñiz's early award of benefits was based, in part, on her condition of depression, and even in 1999, Dr. Sacks concluded Muñiz was suffering from a "major depression, recurrent."

To the extent that there are missing medical records that would be of assistance in clarifying Muñiz's mental limitations, the Commissioner should make every attempt to obtain those records.

Thus, in remanding, the Court advises the ALJ to ensure that a psychiatric consultative evaluation is conducted, which may further clarify the type of work, if any, Muñiz can perform. To the extent that a VE again testifies and there are discrepancies between Muñiz's abilities and the D.O.T. requirements of identified positions, the VE must adequately explain the discrepancies. The

Court need not reach Muñiz's third argument that the ALJ ignored evidence of Muñiz's alleged difficulty interacting with others because the consultative exam will require a new evaluation of Muñiz's current mental limitations, if any, including her possible problem of interacting with others.

The Court is concerned with the lengthy delays in resolving this matter.   However, because a number of the delays are attributable to Muñiz and also because the record is replete with questions regarding Muñiz's credibility, the Court declines to remand for an immediate award of benefits and further declines to decide that Muñiz's entitlement to benefits was improperly ceased as of August 1, 1999.

IT IS THEREFORE ORDERED that Plaintiff's motion to remand for a rehearing is GRANTED as set forth in this decision.


　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　Lorenzo F. Garcia
　　　　　　　　　　　　　　　　　　　　　　　　Chief United States Magistrate Judge